# Exhibit D

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION NO. 06-04825

CHESTNUT HILL PRIVATE MORTGAGE CO., INC. f/k/a CHESTNUT HILL MORTGAGE & REALTY, INC., and SD CORPORATION,

Plaintiffs,

v.

STUART H. SOJCHER,

Defendant.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Chestnut Hill Private Mortgage Co., Inc. f/k/a Chestnut Hill Mortgage & Realty, Inc. and SD Corporation bring this action to recover damages arising out of the negligent legal representation provided by their former real estate counsel in connection with several loans, including, among other things, (i) failure to ensure that the collateral was what counsel represented it to be, (ii) failure to obtain and deliver to plaintiffs title policies paid for at closing, (iii) failure to obtain payoff letters and discharges of senior mortgages, (iv) failure to provide and record loan documentation that reflected the existence of the loans, (v) failure to advise plaintiffs on legal risks associated with cross-collateralizing loans with non-borrowers, and (vi) failure to obtain proper and informed consent to counsel's simultaneous representation of borrowers giving rise to impermissible conflicts of interest.

### The Parties

1. Plaintiff Chestnut Hill Private Mortgage Co., Inc. f/k/a Chestnut Hill Mortgage & Realty, Inc. ("Chestnut Hill") is a corporation organized under the laws of Massachusetts with a usual place of business at 21A Highland Circle, Ste. 200, Needham, Massachusetts.

2. Plaintiff SD Corporation is a corporation organized under the laws of Massachusetts with a usual place of business at 64 Newton Street, Brookline, Massachusetts.

3. Defendant Stuart H. Sojcher ("Sojcher") is an attorney who, on information and belief, was admitted to practice law in the Commonwealth of Massachusetts in 1984, with a principal place of business at 229 Berkeley Street, Boston, Massachusetts, and a principal place of residence at 15 Stowell Road, Winchester, Massachusetts. As set out more fully below, Sojcher acted as counsel to Chestnut Hill and SD Corporation in connection with the real estate loan transactions that are the subject of this Complaint.

**Sojcher's Prior Relationship With Plaintiffs**

4. Beginning in or around 1997 and continuing through at least July, 2005, Sojcher from time to time acted as legal counsel to Stuart Levey ("Levey") and/or various affiliates of Levey, including, without limitation, Chestnut Hill and SD Corporation, in connection with numerous real estate loans. Typically, the real estate loan transactions would proceed as follows: (i) Sojcher would introduce Levey to a lending opportunity; (ii) Levey, alone or together with others having an interest in his lending affiliates, would conduct certain due diligence as to the economics of the transaction; a document would be generated by either Sojcher or one of Levey's affiliates setting out the terms of the transaction, including, among other things, identification of the collateral, priority of the mortgage and amount of any senior indebtedness; (iii) Sojcher would then close the loan on behalf of Levey's affiliates, and disburse the loan proceeds in accordance with a disbursing authorization; (iv) Sojcher would issue, as agent, title policies insuring the lender's interests in the collateral in accordance with the terms of the transaction; and (v) Sojcher would receive payment of fees for legal services rendered.

**The 111 W. Eighth Street, Unit G Loan**
**(SD Corporation)**

5. In or around early summer, 2003, Sojcher introduced Levey to a lending opportunity. Sojcher advised Levey of the opportunity to loan $175,000 to a certain Bernard Laverty ("Laverty") which, according to Sojcher, would be secured by a first mortgage on a condominium unit located at Unit G, 111 W. Eighth Street, South Boston, Massachusetts ("South Boston Unit G"), which Sojcher advised was owned by Laverty as trustee of BLJ Realty Trust. Sojcher advised Levey that the loan proceeds would be used principally to refinance existing mortgage debt on the property. Acting through and on behalf of SD Corporation, Levey agreed to make the loan ("Unit G Loan"). SD Corporation retained Sojcher to represent it in connection with the loan. In agreeing to make the Unit G Loan, SD Corporation valued South Boston Unit G at $300,000, and relied upon the legal counsel of Sojcher to ensure that its loan would be secured by a first mortgage.

6. On or about July 15, 2003, the Unit G Loan closed. Sojcher was paid $1,850 for legal fees and $437.50 for a title policy. SD Corporation never received the title policy.

7. Following default by the borrower, in or around May, 2005, SD Corporation initially retained Sojcher to commence foreclosure action. Sojcher purported to file a complaint to foreclose with the Land Court. Thereafter SD Corporation retained other counsel and discovered that its legal postion was not what Sojcher had represented. In fact, South Boston Unit G was not owned by BLJ Realty Trust, but rather by a certain Adam Corporation, and SD Corporation does not have any mortgage on South Boston Unit G.

8. Through his negligence, Sojcher (i) failed to ascertain the true owner of South Boston Unit G and failed to obtain any mortgage from such owner to secure the Unit G Loan; and (ii) failed to issue and provide the title policy paid for by SD Corporation. Further, through

his negligence, Sojcher failed to advise SD Corporation of the true ownership of South Boston Unit G, but purported to commence a foreclosure action, leading SD Corporation to believe falsely that it could bid in at its foreclosure to protect its mortgage claim.

9. During the relevant time period, Sojcher was also counsel to Laverty and/or his affiliates in connection with various real estate development projects, requiring, on information and belief, continuous infusions of cash. Sojcher did not obtain SD Corporation's consent to simultaneous representation of SD Corporation and Laverty and his affiliates, or to the extent any such consent was obtained, it was uninformed and otherwise improper. Sojcher's loyalty to Laverty and his interests in helping Laverty raise cash impaired Sojcher's representation of SD Corporation in connection with the Unit G Loan.

10. As of the filing of this Complaint, the outstanding principal balance of the Unit G Loan remains $175,000. As a proximate consequence of Sojcher's negligence in representing SD Corporation, SD Corporation has suffered damages in an amount no less than $175,000, plus interest and legal fees that have been incurred (less payments made on account) and continue to be incurred in connection with loan enforcement action.

**The Braintree Loan**
**(Chestnut Hill)**

11. In or around early 2005, Sojcher contacted Levey to advise him of a certain lending opportunity to be secured by various condominium-related properties which Sojcher described as being owned, directly or indirectly, by Laverty and a certain Francis ("Frank") Fraine ("Fraine"), and/or members of their family, including, without limitation, Fraine's daughter-in-law, Georgette Clements ("Clements"). Sojcher advised Levey that the borrowers needed approximately $1,575,000 in funds to complete construction and/or development of certain condominium projects and to pay off various senior lenders ("Braintree Loan"). Sojcher

advised Chestnut Hill that the Braintree Loan would be cross-collateralized by various real properties, described further below.

12. On behalf of Chestnut Hill, Levey and another officer of Chestnut Hill, Ronald Pearson ("Pearson"), conducted a number of site visits to inspect the properties and to meet with the borrowers. Following further consultations with Sojcher, Chestnut Hill generated a deal sheet for the transaction and reviewed it with Sojcher. Sojcher, who at the time was an authorized agent of First American Title Insurance Company ("First American"), also advised Chestnut Hill that it would receive title policies on all of its collateral. On or about April 4, 2005, the deal sheet was finalized and Sojcher advised Levey and Pearson that he would close the Braintree Loan on behalf of Chestnut Hill consistent with the deal sheet. Chestnut Hill relied on Sojcher to utilize his legal skills to close the Braintree Loan in accordance with the terms of the Braintree Loan deal sheet.

13. On or about April 19, 2005, the Braintree Loan closed. Chestnut Hill advanced at the closing $1,275,000 in accordance with the terms of a signed Authorization for Disbursements prepared by Sojcher. Funds were wired to Sojcher's client trust fund account. Subsequently, additional funds were advanced and net of certain payments, the total outstanding principal balance remains as of this date at $1,210,000. Chestnut Hill paid Sojcher $6,500 for his legal services in connection with the Braintree Loan closing, and paid an additional $3,650 for title policies.

14. In or around March, 2006, the borrowers defaulted on the Braintree Loan. Chestnut Hill retained the services of other legal counsel to assist it in evaluating and/or commencing loan enforcement action, including, without limitation, foreclosing on its collateral. Beginning in and around April, 2006 and continuing through this date, Chestnut Hill has been

discovering numerous instances in which the Braintree Loan that Sojcher closed was not collateralized in the manner reflected in the Braintree Loan deal sheet and as represented by Sojcher. These include, without limitation, the following:

- No Irish Times Mortgage. Sojcher advised Chestnut Hill that it would receive as additional collateral a second mortgage on real property, which Chestnut Hill valued at $2,000,000, located at 244 Main Street, Worcester, Massachusetts housing an Irish nightclub and pub ("Irish Times Real Estate"), subject to senior indebtedness of $1,350,000. The Irish Times was then in bankruptcy. Chestnut Hill subsequently discovered that it did not receive any mortgage on the Irish Times Real Estate. On information and belief, Sojcher neglected to confirm the amount of the senior debt, neglected to obtain any mortgage in favor of Chestnut Hill and neglected to ensure that all required bankruptcy court approvals had been obtained.

- Unit G – 1734 Liberty Street, Braintree. Sojcher advised Chestnut Hill that it would receive a first mortgage encumbering a condominium unit known as 1734 Liberty Street, Braintree ("Unit G") in the Liberty Ridge Condominium Development, which Chestnut Hill valued at $600,000. Chestnut Hill subsequently discovered that Unit G is not a condominium unit, but refers merely to a developer's phasing rights which had expired before the loan was made. Chestnut Hill also learned that its mortgage on Unit G was subject to a senior $400,000 mortgage. Sojcher also delivered a title policy to Chestnut Hill which is different from the actual state of title.

- Unit D – 1740 Liberty Street, Braintree. Sojcher advised Chestnut Hill that it would receive a first mortgage encumbering a condominium unit known as 1740 Liberty Street, Braintree ("Unit D") in the Liberty Ridge Condominium Development, which Chestnut Hill valued at $300,000. Chestnut Hill subsequently discovered that Unit D suffers from the same phasing rights issue as Unit G. As a consequence, Unit D was not at the time of the loan a buildable lot and consequently had no value. Sojcher also delivered a title policy to Chestnut Hill which is different from the actual state of title.

- Unit F – 1736 Liberty Street, Braintree. Sojcher advised Chestnut Hill that it would receive a second mortgage encumbering a condominium unit known as 1736 Liberty Street, Braintree ("Unit F") in the Liberty Ridge Condominium Development, which Chestnut Hill valued at $900,000. Sojcher advised Chestnut Hill that its mortgage would be subject only to a first mortgage of $550,000. Chestnut Hill subsequently discovered that it did not have a second mortgage; instead, its mortgage was junior to at least four additional mortgages of record totaling approximately $1.6 million. Sojcher also received a premium for the title policy to be issued on Unit F, but, on information and belief, failed to write such a policy and no such policy has as of this date been delivered.

- Unit C – 1742 Liberty Street, Braintree. Sojcher advised Chestnut Hill that it would receive a second mortgage encumbering a condominium unit known as 1742 Liberty Street, Braintree ("Unit C") in the Liberty Ridge Condominium Development, which Chestnut Hill valued at $700,000. Sojcher advised Chestnut Hill that its mortgage would be subject only to a first mortgage of $402,000. Chestnut Hill subsequently discovered that it did not have a second mortgage; instead, its mortgage was junior to at least two additional mortgages of record totaling approximately $200,000. Sojcher also received a premium for the title policy to be issued on Unit C, but, on information and belief, failed to write such a policy and no such policy has as of this date been delivered. Further, Chestnut Hill also discovered that Unit C suffers from the same phasing rights expiration defect as Units D and G.

- 401 W. First Street, South Boston. Sojcher advised Chestnut Hill that it would receive a third mortgage on land located at 401 W. First Street, South Boston, which Sojcher advised was in the final stages of acquiring permits for 46 condominium units, subject to first and second mortgages totaling $4.1 million, which Chestnut Hill valued at $6,000,000 as is. The property was owned by The Geneva, LLC ("Geneva"). On or about June 15, 2006, Geneva filed bankruptcy. Chestnut Hill has learned that that its mortgage is junior to at least four other mortgages of record aggregating $8.9 million and that its secured position in Geneva's bankruptcy proceedings has no value. In addition, Geneva has indicated that it might object to Chestnut Hill's claim. In representing Chestnut Hill, Sojcher failed to advise Chestnut Hill of the risk that creditors of Geneva might challenge Chestnut Hill's claim on the ground that it allegedly received no consideration for the Braintree Loan.

15. During the relevant time period, Sojcher was also counsel to Laverty, Fraine and/or their affiliates and family members in connection with various real estate development projects, requiring, on information and belief, continuous infusions of cash. Sojcher did not obtain Chestnut Hill's consent to simultaneous representation of Chestnut Hill and the borrowers, or to the extent any such consent was obtained, it was uninformed and otherwise improper. Sojcher also failed to disclose that, on information and belief, he had an equity interest on one or more of Laverty's and/or Fraine's real estate projects. Sojcher's loyalty to the borrowers and interest in assisting the borrowers to raise cash impaired Sojcher's representation of Chestnut Hill in connection with the Braintree Loan.

ID # 491993v02/15503-1/ 11.17.2006

**The Marshfield Loan**
**(Chestnut Hill)**

16. Shortly following the Braintree Loan closing, Sojcher advised Chestnut Hill of another lending opportunity - $500,000 to be loaned directly to Laverty (together with his wife, Patricia Laverty, and Laverty, as trustee of B&S Realty Trust) and to be secured by junior mortgages on three properties, including property located at 130 Pokanoket Lane, Marshfield ("Pokanoket Lane") ("Marshfield Loan"). Sojcher initially advised Chestnut Hill that the mortgage on Pokanoket Lane would be junior only to two other mortgages totaling $925,000. Sojcher subsequently wrote a title policy on First American insuring that Chestnut Hill's mortgage was junior only to a single first mortgage with an outstanding balance of $700,000.

17. The Marshfield Loan closed on May 24, 2005, for which Sojcher received $2,200 in legal fees. Following default by Laverty and evaluation of its collateral, Chestnut Hill discovered that its mortgage on Chestnut Hill was as a matter of record junior, not only to two mortgages totaling $940,000 in original principal, but a third mortgage totaling $1.2 million. Sojcher negligently failed (i) to discover this third mortgage in his review of the title; (ii) to disclose the existence of such mortgage to Chestnut Hill; and/or (iii) to obtain a discharge or payoff of such mortgage prior to closing the Marshfield Loan. As a proximate consequence of Sojcher's negligence, Chestnut Hill has suffered as damages in connection with the Marshfield Loan the entire $500,000 loaned, plus interest accruing on the Marshfield Loan and legal fees incurred and continuing to incur in connection with enforcement of the Marshfield Loan.

18. During the relevant time period, Sojcher was also counsel to Laverty and/or his affiliates in connection with various real estate development projects, requiring, on information and belief, continuous infusions of cash. Sojcher did not obtain Chestnut Hill's consent to simultaneous representation of Chestnut Hill and Laverty and his affiliates, or to the extent any

such consent was obtained, it was uninformed and otherwise improper. Sojcher's loyalty to the borrowers and interests in assisting the borrowers to raise cash impaired Sojcher's representation of Chestnut Hill in connection with the Marshfield Loan.

**The West Roxbury Loan**
**(Chestnut Hill)**

19. In or around June, 2005, Sojcher contacted Levey to advise him of a certain lending opportunity to be secured by various condominium and other properties which Sojcher described as being owned, directly or indirectly, by Laverty and a certain Richard Sharp ("Sharp"), which allegedly had an affiliation with Fraine. Sojcher advised Levey and Pearson, then acting on behalf of Chestnut Hill, that the borrowers needed approximately $700,000 in funds to bring two senior lenders current and to pay certain construction expenses in connection with the development of a 48-unit condominium project located at 5168 Washington Street, West Roxbury, Massachusetts ("West Roxbury Project") ("West Roxbury Loan"). The West Roxbury Project was owned by SOS Realty, LLC ("SOS"), whose controlling member Sojcher advised was Laverty. Sojcher also advised Chestnut Hill that it would receive as additional collateral first or second mortgages on various other real estate as described further below.

20. Sojcher assured Chestnut Hill that the borrowers had a sound business plan for the West Roxbury Project. In particular, Sojcher advised Chestnut Hill of the following:

- That the Chestnut Hill loan would be secured by a third mortgage junior to two mortgages aggregating approximately $8,850,000.
- That based on signed purchase and sale agreements for units in Building One (consisting of 24 units), the total sale proceeds from Building One would yield approximately $8,350,000, leaving senior indebtedness of only $500,000.
- That upon completion of Building Two (consisting of the remaining 48 units), the borrowers expected to generate a profit of $5.9 million.

ID #491993v02/15503-1/11.17.2006

- That the West Roxbury Loan would be repaid within 60 days out of the proceeds of future advances by the senior lenders.

21. On behalf of Chestnut Hill, Levey and Pearson conducted a number of site visits to inspect the properties and to meet with the borrowers. Following further consultations with Sojcher in which Sojcher confirmed the foregoing advice, Chestnut Hill generated a certain West Roxbury Loan Summary which was reviewed with Sojcher who confirmed that the loan would close consistent with the West Roxbury Loan Summary. Chestnut Hill relied on Sojcher to utilize his legal skills to close the West Roxbury Loan in accordance with the terms of the West Roxbury Loan Summary and his other representations.

22. On or about July 14, 2005, the West Roxbury Loan closed. Chestnut Hill advanced at the closing $700,000 in accordance with the terms of a signed Authorization for Disbursements prepared by Sojcher. The $700,000 in funds were wired to Sojcher's client trust fund account. Chestnut Hill paid Sojcher $3,000 for his legal services in connection with the West Roxbury Loan closing, and $2,150 for title policies.

23. In or around October, 2005, the borrowers defaulted on the West Roxbury Loan when they failed to pay the loan. Chestnut Hill subsequently retained the services of legal counsel to assist it in evaluating and/or commencing loan enforcement action, including, without limitation, foreclosing on its collateral, and engaged in various work-out discussions with the borrowers and one of the senior lenders. Beginning in or around April, 2006 and continuing through this date, Chestnut Hill has been discovering numerous instances in which the West Roxbury Loan that Sojcher closed for it was not collateralized in the manner reflected in the West Roxbury Loan Summary and as represented by Sojcher. These include, without limitation, the following:

- West Roxbury Project Business Plans. The business plan which Sojcher advised Chestnut Hill would occur did not in fact occur and SOS filed bankruptcy. Chestnut Hill has learned that Building One had still not been completed and that even following sales of all of the units in Building One, the senior mortgage indebtedness was the same as it was represented to be at the time of the loan. Sojcher had no basis for making any of the business-related representations he made concerning the West Roxbury Project, and failed to ascertain whether his business advice was grounded in objectively verifiable facts concerning the state of the West Roxbury Project.

- Senior Liens on 130 Pokanoket Lane, Marshfield. Sojcher advised Chestnut Hill that it would receive a mortgage on the real property and building located at 130 Pokanoket Lane, Marshfield, consisting of Laverty's principal residence, which Chestnut Hill valued at $1,500,000. Initially, Sojcher advised Chestnut Hill that its mortgage would be junior only to $925,000 in senior debt (in addition to Chestnut Hill's own pre-existing blanket $500,000 mortgage). Chestnut Hill subsequently learned that its mortgage was subject to another senior mortgage of record in the amount of $1.2 million.

- Late Recording of Mortgage on 153 Rowe Street. Sojcher advised Chestnut Hill that it would receive a mortgage on the real property and building located at 153 Rowe Street, Marshfield, which Chestnut Hill valued at $500,000. Sojcher advised Chestnut Hill that this mortgage would be junior only to a first mortgage in the amount of $91,000 (in addition to Chestnut Hill's own pre-existing blanket $500,000 mortgage). Sojcher failed to record this mortgage until more than three months after the loan closed - October 31, 2005. During the interim period, on August 30, 2005, another mortgage was recorded in favor of a third-party in the amount of $250,000, and on September 1, 2005, an attachment was recorded against the property in the amount of $15,000.

24. During the relevant time period, Sojcher was also counsel to Laverty and/or his affiliates in connection with various real estate development projects, requiring, on information and belief, continuous infusions of cash. Sojcher did not obtain Chestnut Hill's consent to simultaneous representation of Chestnut Hill and Laverty and his affiliates, or to the extent any such consent was obtained, it was uninformed and otherwise improper. Sojcher's loyalty to the borrowers and interests in the borrowers to raise cash impaired Sojcher's representation of Chestnut Hill in connection with the West Roxbury Loan.

**COUNT I**
**(SD Corporation's Negligence Claim Against Sojcher)**

25. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-24 of this Complaint as if fully set forth herein.

26. Sojcher held himself out to have expertise in the field of real estate law, and was counsel to SD Corporation in connection with the Unit G Loan.

27. In connection with the negotiation, documentation and implementation of the Unit G Loan, and subsequently in connection with commencement of foreclosure proceedings, Sojcher owed SD Corporation an obligation to exercise a reasonable degree of care and skill in the performance of his legal duties. Sojcher also owed SD Corporation a duty of loyalty.

28. By (i) failing to ascertain the true owner of South Boston Unit G and failing to obtain any mortgage from such owner to secure the Unit G Loan; (ii) failing to issue and provide the title policy paid for by SD Corporation, and (iii) allowing his conflicting loyalties to Laverty and SD Corporation to impair his ability to provide adequate representation to SD Corporation, Sojcher failed to exercise reasonable care and skill in handling the Unit G Loan closing.

29. As a proximate cause of Sojcher's negligence as alleged above, SD Corporation suffered damages equal to the present outstanding principal balance of its mortgage loan, plus interest and legal fees incurred and continuing to incur in connection with enforcement of such loan.

WHEREFORE, SD Corporation demands judgment under this Count I against Sojcher in an amount to be determined, plus interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

**COUNT II**
**(Chestnut Hill's Negligence Claim Against Sojcher – Braintree Loan)**

30. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-24 of this Complaint as if fully set forth herein.

31. Sojcher held himself out to have expertise in the field of real estate law, and was counsel to Chestnut Hill in connection with the Braintree Loan.

32. In connection with the negotiation, documentation and implementation of the Braintree Loan, Sojcher owed Chestnut Hill an obligation to exercise a reasonable degree of care and skill in the performance of his legal duties. Sojcher also owed Chestnut Hill a duty of loyalty.

33. By (i) failing to ascertain adequately the existence of senior mortgages on the various Braintree collateral, or (ii) having ascertained the existence of such senior mortgages, having failed to obtain payoff letters and/or discharges, (iii) failing to ascertain the expiration of the phasing rights as to Units C, D and G, or (iv) having ascertained such expiration, having failed to take steps to ensure the extension of such phasing rights, (v) failing to analyze or otherwise consider the legal risks posed by cross-collateralization with properties not owned by any borrowers, (vi) failing to advise Chestnut Hill of all or any of the same prior to closing, (vii) failing to obtain and record all necessary loan documentation to secure all the agreed upon collateral, (viii) failing to issue and deliver title policies paid for at closing, and (ix) allowing his conflicting loyalties to Laverty, Fraine and their affiliates and family members to impair his ability to provide adequate representation to Chestnut Hill, Sojcher failed to exercise reasonable care and skill in handling the Braintree Loan closing.

34. As a proximate cause of Sojcher's negligence as alleged above, Chestnut Hill has suffered damages equal to the present outstanding principal balance of its mortgage loan, plus

interest and legal fees incurred and continuing to incur in connection with enforcement of such loan.

WHEREFORE, Chestnut Hill demands judgment under this Count II against Sojcher in an amount to be determined, plus interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

**COUNT III**
**(Chestnut Hill's Negligence Claim Against Sojcher – Marshfield Loan)**

35. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-24 of this Complaint as if fully set forth herein.

36. Sojcher held himself out to have expertise in the field of real estate law, and was counsel to Chestnut Hill in connection with the Marshfield Loan.

37. In connection with the negotiation, documentation and implementation of the Marshfield Loan, Sojcher owed Chestnut Hill an obligation to exercise a reasonable degree of care and skill in the performance of his legal duties. Sojcher also owed Chestnut Hill a duty of loyalty.

38. By (i) failing to ascertain adequately the existence of senior mortgages on certain of the Marshfield Loan collateral, or (ii) having ascertained the existence of such senior mortgages, having failed to obtain payoff letters and/or discharges, (iii) failing to advise Chestnut Hill of all or any of the same prior to closing, and (iv) allowing his conflicting loyalties to Laverty and his affiliates and family members to impair his ability to provide adequate representation to Chestnut Hill, Sojcher failed to exercise reasonable care and skill in handling the Braintree Loan closing.

39. As a proximate cause of Sojcher's negligence as alleged above, Chestnut Hill has suffered damages equal to the present outstanding principal balance of its mortgage loan, plus

interest and legal fees incurred and continuing to incur in connection with enforcement of such loan.

WHEREFORE, Chestnut Hill demands judgment under this Count III against Sojcher in an amount to be determined, plus interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

## COUNT IV
## (Chestnut Hill's Negligence Claim Against Sojcher – West Roxbury Loan)

40. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-24 of this Complaint as if fully set forth herein.

41. Sojcher held himself out to have expertise in the field of real estate law, and was counsel to Chestnut Hill in connection with the West Roxbury Loan.

42. In connection with the negotiation, documentation and implementation of the West Roxbury Loan, Sojcher owed Chestnut Hill an obligation to exercise a reasonable degree of care and skill in the performance of his legal duties. Sojcher also owed Chestnut Hill a duty of loyalty.

43. By (i) failing to ascertain adequately the existence of senior mortgages on certain of the West Roxbury Loan collateral, or (ii) having ascertained the existence of such senior mortgages, having failed to obtain payoff letters and/or discharges, (iii) failing to advise Chestnut Hill of all or any of the same prior to closing, (iv) failing to record the mortgage on the 53 Rowe Street, Roslindale Property at the time of closing, (v) failing to issue and deliver title policies paid for at closing, and (vi) allowing his conflicting loyalties to Laverty, Fraine and their affiliates and family members to impair his ability to provide adequate representation to Chestnut Hill, Sojcher failed to exercise reasonable care and skill in handling the West Roxbury Loan closing.

ID #491993v02/15503-1/ 11.17.2006

44. As a proximate cause of Sojcher's negligence as alleged above, Chestnut Hill has suffered damages equal to the present outstanding principal balance of its mortgage loan, plus interest and legal fees incurred and continuing to incur in connection with enforcement of such loan.

WHEREFORE, Chestnut Hill demands judgment under this Count IV against Sojcher in an amount to be determined, plus interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

**COUNT V**
**(Breach of Duty of Loyalty Against Sojcher – All Loans)**

45. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-24 of this Complaint as if fully set forth herein.

46. Prior to introducing Levey and Pearson to the lending opportunities described above, on information and belief, Sojcher represented Laverty and Fraine and/or their family and affiliates in connection with a variety of real estate matters and continued representing them simultaneously with his representation of the Plaintiffs in connection with the four loans described above. Sojcher did not adequately or fully disclose to Plaintiffs the existence of these conflicts of interest.

47. Further, Sojcher failed to disclose to Plaintiffs that he retained an equity interest in certain of these transactions and/or other transactions in which Laverty and/or Fraine or members of their families had interests.

48. Plaintiffs did not give informed consent in writing to Sojcher's simultaneous representation. In particular, Sojcher was aware of but failed to disclose to Plaintiffs that the condominium development projects of Laverty and Fraine were failing, that multiple loans were already in default and that numerous other lenders in senior positions were placing such financial

pressures on Laverty and Fraine that the Chestnut Hill loans were almost certain to default. Sojcher's loyalties to Laverty and Fraine impaired his ability to adequately represent the interests of Plaintiffs. Had Plaintiffs known of the full nature and extent of the financial difficulties facing Laverty and Fraine, the existence of the other senior mortgages and/or of the extent of Sojcher's loyalty to the borrowers, Plaintiffs would not have made any of the loans that they made.

49. In connection with the negotiation, documentation and implementation of the four loans, Sojcher owed Plaintiffs a duty of loyalty.

50. Sojcher's simultaneous business and attorney-client relationships with Laverty and Fraine and their affiliates impaired his ability to adequately represent the interests of Plaintiffs.

51. By undertaking to represent the Plaintiffs under the circumstances described above, Sojcher breached his duty of loyalty to Plaintiffs.

52. As a proximate consequence of Sojcher's breach of his duty of loyalty, Plaintiffs have suffered damages equal to the total amount loaned of approximately $2.6 million, plus interest, plus the legal fees which Plaintiffs have incurred and continue to incur to enforce these loans and otherwise to protect their various positions.

WHEREFORE, Plaintiffs jointly demand judgment under this Count V against Sojcher in an amount to be determined, plus interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

**COUNT VI**
**(Violations of Chapter 93A Against Sojcher – All Loans)**

53. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-52 of this Complaint as if fully set forth herein.

54. In connection with the transactions described above, the Plaintiffs and Sojcher were engaged in trade or commerce within the meaning of M.G.L. c. 93A, § 1.

55. Sojcher's conduct as described above constituted unfair or deceptive acts or practices within the meaning of M.G.L. c. 93A, § 2, as a result of which Plaintiffs suffered a loss of money or property equal to the amount loaned less the amount collected.

WHEREFORE, Plaintiffs jointly demand judgment under this Count VI against Sojcher in an amount to be determined, plus interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

CHESTNUT HILL PRIVATE MORTGAGE CO., INC. f/k/a CHESTNUT HILL MORTGAGE & REALTY, INC. and SD CORPORATION

By their attorneys,

David J. Reier (BBO# 546202)
POSTERNAK BLANKSTEIN & LUND LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-8004
Tel: (617) 973-6100

Dated: November 17, 2006

ID # 491993v02/15503-1/ 11.17.2006